UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

REDNER'S MARKETS, INC.,
       Plaintiff               *
                                  *
          v.              *              Civil No. L-11-1864
                                  *
JOPPATOWNE G.P. LIMITED      *
PARTNERSHIP,                  *
       Defendant          *
                            *******

**MEMORANDUM OPINION**

## I.     Introduction

Plaintiff, Redner's Markets, Inc. ("Redner's"), operates a chain of grocery stores, one of which is located in the Joppatowne Plaza Shopping Center.  In this case, Redner's sues its landlord, Joppatowne G.P. Limited Partnership ("Joppatowne"), for breach of a restrictive covenant found in its lease.  This Court has diversity jurisdiction over the dispute because Redner's and Joppatowne are citizens of different states.  See 28 U.S.C. § 1332.  Following discovery, the case was tried before the Court, sitting non-jury.  This Memorandum states the Court's findings of fact and conclusions of law as is required by Federal Rule of Civil Procedure 52.  For the reasons stated herein, the Court concludes that Joppatowne has breached the Restrictive Covenant.  Further proceedings are required, however, to determine the full extent of the breach and to award relief.

## II.     The Dispute

Redner's is a Pennsylvania corporation that operates 40 or so grocery stores in Pennsylvania, Maryland, and Delaware.  Redner's stores sell the type of items that one would

1

typically find in a grocery store or supermarket, but at lower prices made possible by the company's no-frills, food warehouse approach.  Joppatowne owns and manages the Joppatowne Plaza Shopping Center ("Shopping Center"), which is located in Joppatowne, Maryland at the intersection of Maryland Route 40 and Joppa Farm Road.

Following extensive negotiations conducted by real estate experts, Redner's and Joppatowne, on November 23, 2005, executed a 61-page, 20-year lease (the "Lease") involving approximately 54,000 square feet of retail space.  On November, 20, 2006, the parties executed an amendment to the Lease that authorized Redner's to build and operate a small gas station on the Shopping Center's parking lot.[1]  Both the grocery store and the gas station are currently open for business.

The dispute concerns three sections of the Lease:  Article XIII (Restrictive Covenants), Article IV (Rent), and Article XX (Default by Tenant or Landlord).   Briefly stated, Redner's contends that Joppatowne violated the Restrictive Covenant by permitting an Amish Farmer's Market (the "Market" or the "Farmer's Market") that directly competes with Redner's.  Joppatowne denies that the Market is a prohibited use.  Moreover, pointing to Article IV, Joppatowne contends that Redner's cannot enforce the Restrictive Covenant because it is in breach of its obligation to pay percentage rent on gasoline sales.  Finally, Joppatowne maintains that Redner's has failed to satisfy the notice and opportunity to cure requirements of Article XX.

---

[1]      The parties agreed that Redner's could not open a convenience store in connection with the gas station.  Redner's was permitted to open a small payment booth selling limited incidental items, such as chewing gum and cigarettes.

Absent the required notice, no event of default recognized by the Lease can have occurred, Joppatowne asserts.

### III.   The Amish Farmer's Market

The departure of a major tenant created a substantial vacancy in the Shopping Center. The vacancy attracted the attention of Brian Miller, an entrepreneur who operates a large, successful flea and farmer's market in the North Point Plaza Shopping Center in Dundalk, Maryland.  Miller was interested in opening a second flea market and farmer's market at Joppatowne.

On October 21, 2009, after negotiations, Joppatowne entered into a 10-year lease with, JTF, LLC ("JTF"), a Maryland limited liability corporation that Miller created to do business at the Shopping Center.[2]  Miller is JTF's sole employee.  All told, JTF leases approximately 108,000 square feet.  This space is divided between the flea market (roughly 96,000 square feet) and the Amish Farmer's Market (roughly 12,000 square feet).[3]  The two sections are physically separated by a fence that encloses the Amish Farmer's Market.   A sign at the entrance clearly designates the area inside the enclosure as the "Amish Farmer's Market."

---

[2]    Although the JTF lease was signed on October 21, 2009, the lease term did not begin until March 1, 2010.  The initials JTF apparently stand for Joppatowne Flea Market.

[3]    As will be discussed infra, Redner's and Joppatowne disagree as to the square footage of the JTF space as a whole and as to the portion devoted to the Amish Farmer's Market.  Redner's contends that the relevant measurements are 109,943 square feet (JTF overall) and 12,319 square feet (the Amish Farmer's Market and All Fresh Seafood & Produce, a stall outside of the enclosure).  Joppatowne asserts that the numbers are 104,531 square feet and 12,068 square feet, respectively.  Despite this disagreement, the numbers stated above are reasonably accurate.

Joppatowne and Miller recognized that they were running the risk that the Amish Farmer's Market would violate the restrictive covenant in Redner's Lease.  To address this risk, Joppatowne agreed to defend and indemnify JTF in the event of a suit.  In a letter agreement dated October 15, 2009, Joppatowne agreed that "in the event of legal action based on the issue of a breach of the restrictive covenants in the Redner's Lease," it would defend and indemnify JTF.  Joint Trial Ex. 18.

The Amish Farmer's Market opened on March 17, 2011.  This case focuses on eight stalls that Redner's claims violate the Restrictive Covenant.[4]  Seven of these stalls are located inside the enclosure.  Each of the seven is roughly rectangular in shape with counter or display space on the perimeter and working or storage space inside.[5]  The enclosure also includes two seating and table areas, as well as a shopping cart pick up and return area.

The seven stalls inside the enclosure are part of a loosely organized group headed by Menno Beiler, who owns and operates Beiler's BBQ.  JTF and Beiler signed an untitled, two paragraph agreement dated December 2, 2010.  This document reads in pertinent part:  "We agree to pay JTF… for 11,500 sq. ft…. for duration of 5 year total period…. Each standholder must have liability insurance JTFLLC as rider."  Pl.'s Trial Ex. 1.  The term "standholder" refers to the proprietors of the seven stalls or stands within the enclosure.  The standholders, all of whom are Amish, do not have a written contract among themselves or with Beiler.  They have a handshake agreement among themselves to split the rent to JTF according to the square footages

---

[4]      These eight retailers have been referred to variously as vendors, stalls, proprietors, retailers, and stores.  The Court will use these terms interchangeably.

[5]      Depending on their relationship to the wall of the enclosure and to each other, stalls differ as to the number of sides available for display or counter space.

of their respective stalls.  Each pays one seventh of the rent owed for the commonly shared space within the enclosure.  The common space includes everything outside the perimeters of each stall, including the aisle space and the seating areas.  Beiler collects the rent and pays it to JTF.

Although the Amish Farmer's Market is promoted as such, each stall is separately owned and operated.  Each has its own trade name and signage.  The seven stalls within the enclosure are Dutch Delights, Dutch Pantry Fudge, Kreative Kitchen, Lapp's Fresh Meat, King's Cheese & Deli, Beiler's BBQ, and Beiler's Baked Goods.[6]

The eighth stall, All Fresh Seafood & Produce ("All Fresh"), is located outside the enclosure.  The proprietors of All Fresh, John Walters and Mary Roth, are neither Amish nor part of the Beiler group.  All Fresh has a separate lease with JTF.[7]  Although All Fresh is rectangular in configuration, the rectangle is not enclosed, and customers have access to a number of display areas and coolers located inside.

Redner's also challenges two "Vendor Stalls" located outside the enclosure.  Information as to the proprietor or proprietors of the two small Vendor Stalls, both of which are located outside the enclosure, is absent from the record.[8]

---

[6]      Beiler's BBQ and Beiler's Baked Goods have different owners.

[7]      It is unclear whether the All Fresh lease is written or oral.

[8]      The Vendor Stalls, which sell convenience store items such as toiletries and dry cereal, are small, roughly 499 square feet and 148 square feet respectively.  Because the record is inadequate to decide the matters related to the Vendor Stalls, the Court is referring those matters to a United States Magistrate Judge for a report and recommendation.

**IV.     Procedural History**

Although the case was originally filed in the United States District Court for the Eastern District of Pennsylvania, it was transferred to this Court on July 7, 2011.  Neither side prayed a jury or filed a dispositive motion.  Following discovery, the case proceeded directly to a seven-day bench trial.[9]   Because the Lease, particularly Article XIII, is long and complicated, all agreed that the Court would benefit from a thoroughly developed evidentiary record.[10]

Redner's called eight witnesses at trial:

- Diane Herr, Manager of Real Estate for Redner's;

- Gary M. O'Brien, Vice President of Retail, Perishable Operations, for Redner's;

- John Walters, the proprietor of All Fresh;

- Jonathan McGowan, an architect with Kahn Partners.  Pursuant to Federal Rule of Evidence 702, the Court accepted McGowan as an expert in the field of architecture;

- Reuben G. King, the proprietor of King's Cheese & Deli;

- Brian Miller, the owner of JTF;

- Robert Fowler, General Counsel for The Cordish Company, the umbrella company that controls Joppatowne;

- Pamela Cala, a partner in the law firm of Kozloff Stoudt.  Ms. Cala participated in the Lease negotiations on behalf of Redner's; and

---

[9]     For a variety of reasons, the seven trial days were not consecutive.

[10]     In an Order memorializing the pretrial conference, the Court stated that it would "reserve ruling on whether the language of the Restrictive Covenant is ambiguous or not" and would "receive parole evidence, including the relevant iterations of the Restrictive Covenant."  Docket No. 56.  Interpreting and applying the Lease has required the Court to make legal and factual decisions.

- Edward Suarez, a Certified Public Accountant.  Pursuant to Rule 702, the Court accepted Suarez as an expert in the field of forensic accounting.[11]

  Joppatowne called five witnesses:

- Shellie Curry, an architect at Curry Architects.  The Court accepted Curry as a Rule 702 expert in the field of architecture;

- Menno Beiler, the proprietor of Beiler's BBQ;

- Elmer Lee Lapp, the proprietor of Lapp's Fresh Meats;

- Larry M. Epstein, a Certified Public Accountant.  The Court accepted Epstein as a Rule 702 expert in the field of forensic accounting; and

- Robert Fowler.

## V.  Analysis of Threshold Legal Issues

### a.  Joinder of Non-Parties Under Federal Rule of Civil Procedure 19

After the trial was over, Joppatowne filed a Motion to Dismiss, contending that Federal Rule of Civil Procedure 19 mandated the joinder of JTF and the stall owners.  Once the Motion was fully briefed, the Court heard argument.   For the reasons stated below, the Court will deny the Motion.

Broadly speaking, Rule 19 mandates a two-step inquiry.  First, the court must determine whether the absentee is a "required party" as defined by Rule 19(a).  If so, the absentee is considered "necessary" to the litigation and must be joined if feasible.  When joinder is not feasible, Rule 19(b) requires the court to decide "whether in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  An absentee is

---

[11]   The Court accepted Suarez's deposition in lieu of his live testimony.

considered "indispensable" if the action should not proceed without him.  "Where joinder of necessary and indispensable persons would destroy complete diversity, and diversity is the only basis for subject matter jurisdiction, the action must be dismissed."  Dickson v. Morrison, No. 98-2446, 187 F.3d 629, at *4 (4th Cir. July 27, 1999).

Turing to the text of Rule 19(a)(1) (Required Party), a person who is subject  to service of process and whose joinder will not deprive the court of subject matter must be joined if:

    (A)   in that person's absence, the court cannot accord complete relief among existing parties; or

    (B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

        (i)   as a practical matter impair or impede the person's ability to protect the interest; or

        (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

For purposes of federal diversity jurisdiction, Redner's is a citizen of Pennsylvania and Joppatowne is a citizen of Maryland.  Because the matter in controversy exceeds $75,000, the requirements of 28 U.S.C § 1332 are satisfied.  The joinder of JTF would not defeat diversity because it is a citizen of Maryland.  Most of the stall owners are citizens of Pennsylvania,

however.  Joining them would destroy diversity and deprive this Court of jurisdiction over all claims excepting a minor rent dispute that is of interest only to Joppatowne and Redner's.[12]

When a required party cannot be joined, Rule 19(b)(When Joinder Is Not Feasible) provides that "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."   The factors for the court to consider include:

(1)   the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2)   the extent to which any prejudice could be lessened or avoided by:

(A)   protective provisions in the judgment;

(B)   shaping the relief; or

(C)   other measures;

(3)   whether a judgment rendered in the person's absence would be adequate; and

(4)   whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Even though JTF and the stall owners have an interest in the outcome of the case, they are neither necessary nor indispensable parties.  This case is a breach of contract action involving the two parties to the Lease.  The absent parties are strangers to the Lease, being neither signatories nor third party beneficiaries.  Were JTF and the stall owners parties, there would be

---

[12]      The owner of All Fresh is a citizen of Maryland.  Although the record is incomplete on this score, most, if not all, of the other stall owners are Pennsylvania citizens.  The dispute over whether Redner's owes percentage rent on gasoline sales does not involve the stall owners.

no claims that they could assert against Redner's.  Redner's has a theoretical claim against them for intentional interference with Redner's rights under the Lease.  Redner's, however, has brought no such claim and its counsel definitively stated on the record that Redner's will bring no such claim.[13]  With respect to the dispute between Redner's and Joppatowne over the Restrictive Covenant, therefore, JTF and the stall owners lack standing.  Were they parties to the suit, they could serve only as a rooting gallery, offering Joppatowne encouragement.

 Despite their lack of standing, JTF and the stall owners do have an interest relating to the subject matter of the instant suit.  A verdict in Redner's favor would set in motion a series of events that would eventually involve them.  If Redner's establishes a breach of the Restrictive Covenant, Joppatowne would be contractually obligated to stop the violations.  Joppatowne, as JTF's landlord, would demand that JTF end the violations.  JTF, as the stall owners' landlord, would demand that they cease any violative use.

Even though the falling contractual dominoes may impact JTF and the stall owners, this does not mean that they are necessary or indispensable parties.  Under Rule 19, "a person does not become a necessary party to an action simply because the determination of the action will affect that person's rights under a separate or subsequent contract."  Washington Nat. Ins. Co. v. Philadelphia Auth. For Indus. Dev., No. 91-5826, 1992 WL 33934, at *1 (E.D. Pa. Feb. 19, 1992); see also Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Ctr., Inc., 564 F.2d 816, 820 (8th Cir. 1977); Video Towne, Inc. v. RB-3 Assocs., 125 F.R.D. 457, 459

---

[13]     Because Redner's has waived any claim against JTF and the stall owners for intentional interference with contract, there is no "actual controversy" between Redner's and the non-parties that would support a declaratory judgment suit.  See 28 U.S.C. § 2201.

(S.D. Ohio 1988) ("[A] person does not become an indispensable party to an action to determine rights under a contract simply because determination of the action will affect that person's rights under a separate or subsequent contract—including the rights of a third party lessee to property at issue in the original action.").  Courts have often recognized that Rule 19 "does not contemplate joinder of any party who might possibly be affected by a judgment in any way." Shelton v. Exxon Corp., 843 F.2d 212, 218 (5th Cir. 1988).

The logic of these cases is sound as the following example illustrates.  Assume that a fast food company issues a license to a franchisee to operate a restaurant.  License in hand, the franchisee enters into contracts, inter alia, with employees, food and beverage suppliers, a trash hauling company, an accounting firm, and the gas and electric company.  Moreover, once the franchise has opened for business, the franchisee pays taxes to the state and local government.  If the fast food company sues to revoke the license, many will be affected by the outcome of the case.  This does not mean, however, that all are necessary or indispensable parties to the breach of contract suit between the fast food company and the franchisee.  An economic interest in the outcome of a breach of contract suit does not confer standing on a person who is a stranger to the contract.[14]

A number of other factors bearing upon the Rule 19 calculus merit consideration.  JTF and the stall owners were fully aware of the suit and its potential to disrupt their businesses, but they did not seek to intervene.[15]  With respect to the contention that the Restrictive Covenant

---

[14]	Neither JTF nor the stall owners are third party beneficiaries of any rights created by the Lease.
[15]	JTF's principal, Brian Miller, testified at trial as did four of the stall owners.  An article that appeared in the Baltimore Sun concerning the Redner's/Joppatowne dispute included interviews with

does not apply to the Amish Farmer's Market, there was no practical reason for them to intervene. Their interests and Joppatowne's interests in defeating the Restrictive Covenant were aligned. At trial, JTF and the stall owners cooperated with Joppatowne's attorney, who called four of the stall owners and JTF's principal, Brian Miller, as witnesses. While Joppatowne's attorney was representing only Joppatowne, he handled the case with his customary thoroughness and diligence, advancing every conceivable factual and legal argument against the enforceability of the Restrictive Covenant.

Joppatowne points out that it, JTF, and the stall owners have potential claims against one another that might lead to conflicting obligations if another court were to disagree with this Court's interpretation of the Lease. An understanding of this issue requires a discussion of the claims that might be asserted in further litigation.

Because of the indemnity agreement discussed supra, the legal interests of JTF and Joppatowne largely overlap. Both Joppatowne and Brian Miller recognized the risk that Redner's would sue to oust a farmer's market. Joppatowne, decided that the risk of suit was outweighed by the benefit of filling a large vacant area in the shopping center. Before Miller of JTF agreed to lease the space, he obtained an indemnity agreement from Joppatowne. Joint Trial Ex. 18. The JTF/Joppatowne letter agreement of October 15, 2009 provides in pertinent part:

---

several of the stall owners. Steve Kilar, <u>Cordish Goes to the Mat for Amish Market in Joppa</u>, BALTIMORE SUN, Aug. 26, 2012, http://articles.baltimoresun.com/2012-08-26/business/bs-bz-cordish-farmers-market-20120826_1_amish-farmers-young-amish-woman-amish-vendors.

In the event of legal action based on the issue of a breach of the restrictive covenants in the Redner's Lease, Landlord will vigorously assert the general position agreed to by the parties herein, contest and/or defend such action, and pay all costs of such litigation, including all attorneys' fees.   Tenant shall cooperate with Landlord in such defense.  If Tenant becomes a party to any such litigation, Landlord shall and hereby does indemnify Tenant, and save it harmless and, [sic] defend it, from any such claim, action, damages, liability and expense….   The Landlord will seek no damages from the Tenant based on the exclusive use provisions, unless there is a court decision determining that there is a violation of the exclusive use provisions, and Tenant continues such use contrary to that court decision.

Joppatowne correctly points out that its interests and JTF's interests are not fully congruent.  In the event of an adverse court decision, JTF is responsible for ending any violative use, including bringing suit against stall owners if necessary.  JTF would be liable to Joppatowne for damages if it is unsuccessful in putting an end to the violation and "Tenant continues such use contrary to that court decision."   Additionally, in the event JTF sues a stall owner, the owner would have an opportunity to assert any claims it might have against either JTF or Joppatowne.[16] Although Joppatowne agreed to indemnify JTF against an adverse verdict, no protection was apparently offered to the stall owners who were sinking their time, effort, and money into the Amish Farmer's Market.

In the event of subsequent litigation, therefore, the possibility of rulings that conflict with this opinion exists.[17]  For a number of reasons, it is not inequitable to subject Joppatowne and

---

[16]     The Court expresses no opinion on the merits of such claims; this case did not address the disclosures or representations made to the stall owners as to the risk they ran when they entered into their leases with JTF.  Neither does the Court offer any opinion on the proper interpretation of the indemnification agreement.

[17]     The Court's limited research failed to determine whether its rulings interpreting the restrictive covenant would have any preclusive effect in subsequent litigation.

JTF to this risk.  First, Joppatowne and JTF foresaw Redner's suit and had ample time to weigh and balance the litigation risks before incurring them.  Second, during a scheduling conference at the very outset of the case, the Court, <u>sua sponte</u>, questioned whether the stall owners and JTF were necessary parties under Rule 19.[18]  Joppatowne did not move under Rule 19 until the end of the trial.  If the Court granted the Motion, the case would be dismissed and re-filed in state court, thereby wasting all of the  time and effort devoted to the trial.  Third, a separate suit, presumably filed in state court, is the proper venue for deciding the rights and obligations of Joppatowne, JTF, and the stall owners.  Redner's has no interest in participating in such a suit, and, presumably, would not be joined as a party.

For these reasons, the Court concludes that neither JTF nor the stall owners are necessary or indispensable parties under Rule 19.

### b.  Notice of Alleged Violation of Lease by Redner's

Joppatowne contends that no "Event of Default By Landlord" has occurred because Redner's failed to provide written notice of the alleged violation of the Restrictive Covenant as required by the Lease.  Section 20.05 of the Lease provides:

> The failure by Landlord in the performance or observation of any covenant, provision, or agreement of this Lease, which default is not cured within thirty (30) days after the giving of notice thereof by Tenant, shall be an Event of Default By Landlord hereunder, unless such default is of such a nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default By Landlord shall occur so long as Landlord shall commence the curing of the default within such thirty (30) day period and shall thereafter diligently prosecute the curing of same.

---

[18]     The Court <u>sua sponte</u> raised the Rule 19 issue a second time during trial.

This section must be read together with section 20.06, which reads:

"Upon the occurrence and continuation of any Event of Default By Landlord, Tenant, with prior written notice to Landlord after any applicable cure period, shall have the right to seek remedies available at law or in equity."

Joppatowne's argument warrants little discussion as it clearly fails.  Putting aside the fact that Redner's suit has been pending for over a year, during which time Joppatowne has steadfastly refused to enforce the Restrictive Covenant, Redner's provided the required notice prior to filing suit.  In a letter of March 16, 2011, Jason Hopp, Vice President and General Counsel of Render's, described the default and demanded that the Landlord enforce the terms of the Lease.  Joint Trial Ex. 23.   Joppatowne faults Hopp for failing to describe the factual basis of the default in sufficient detail.

The text of the letter makes short work of this argument.  Inter alia, Hopp's letter states: "Redner's is providing notice that it believes in good faith that landlord is in violation of section 13.01 of the Lease by permitting your tenant in the former C-Mart space of the Shopping Center to have greater than 6,000 square feet of Gross Floor Area as a food super market or grocery store."  Id.   Hopp also states that his letter, which includes the phrase "Lease Default Notice" in the subject line, "is being issued pursuant to Section 20.05 of the Lease."  Id.

Joppatowne's argument focuses on the fact that Hopp's letter invokes section 13.01(a)(ii)(4), whereas Redner's suit relies on other subsections of section 13.01.  This argument is untenable.  Redner's gave explicit notice that it believed the Farmer's Market to be in violation of the Restrictive Covenant.  The Lease requires notice and not a legal brief. Moreover, in a follow-up letter sent by its attorney on April 5, 2011, Redner's provided a variety

of alternative grounds under which the Farmer's Market violates section 13.01.  Joint Trial

Ex. 24.

### c.   Redner's Non-Payment of Percentage Rent on Gas Sales

Joppatowne argues that Redner's cannot enforce the Restrictive Covenant because it is

default under its obligation to pay rent on gasoline sales.  This contention involves a gas station

that Redner's built in the Shopping Center's parking lot circa 2006.  In 2006, Joppatowne

experienced cost-overruns while building out the Redner's space.  Joppatowne and Redner's

made a bargain under which Redner's agreed to pay additional construction costs of $206,706 in

exchange for Joppatowne's permission to build the gas station.  This agreement was formalized

in both a letter of March 10, 2006 and in Amendment No.1 to Lease, which incorporates the

letter.  Joint Trial Exs.13 and 14, respectively.

Article IV of the Lease obligates Redner's to pay three types of rent:  Annual Minimum

Rent, Percentage Rent, and Additional Rent.  Joppatowne contends that Redner's is required to

pay percentage rent on gasoline sales and sales of other miscellaneous items such as snacks and

candy that are available at a small booth adjacent to the pumps.  There is no need to work

through the complicated rental provisions in the Lease as amended.   The March 10, 2006 letter

from Redner's to Joppatowne, which was incorporated into the Lease, resolves the issue.  In the

letter, Richard Redner, the President and CEO of Redner's, thanked Joppatowne for its

"willingness to allow Redner's to construct gas pumps at no additional rental costs to Redner's."

Joint Trial Ex. 13.

Joppatowne argues that this letter correctly states the parties' understanding as to

Additional Rent, but that Redner's is, nevertheless, obligated to pay Percentage Rent on sales at

the gas station.  The Court disagrees; "no additional rental costs" applies to all three types of

rent, including percentage rent.  Richard Redner used the word "additional" in its ordinary sense

and not as a defined term in the Lease.  Moreover, the letter uses the broad phrase "rental costs,"

connoting that the gasoline operation would not increase Redner's rent obligations in any way.

For this reason, the Court finds that the letter applies to the gas station operation, including the

sale of gasoline and incidental items.   Accordingly, Redner's is not in default under the Lease,

and there is no impairment of its rights under section 13.01.

## VI.   Analysis of Restrictive Covenant

The dispute between Redner's and Joppatowne centers on the meaning of Article XIII of

the Lease, headed "Restrictive Covenants."[19] The Article includes a single section, 13.01,

"Landlord's Restrictive Use Covenant."  Section 13.01 is divided into three subsections.

Subsection (a) (Use Covenant) lays out the restrictions.  Subsection (b) (Exceptions to Use

Covenant) lists a number of retail operations that are expressly "not preclude[d]" by subsection

(a).  Subsection (c) (Clarification of Exceptions to Use Covenant)) refines the exceptions as they

relate to the sale of frozen foods and dairy products.

The Lease is a contract.  The Court must apply the rules of contract construction when

interpreting the Lease and its provisions.  Reading the Lease as a whole, the Court first asks

whether Article XIII is clear and unambiguous.  If so, the Court will interpret the language "as a

matter of law."  If, however, the contract language is ambiguous, meaning susceptible of two or

more reasonable interpretations, then the Court will admit parole evidence bearing on the intent

---

[19]     The Addendum to this opinion includes a copy of Article XIII.

of the parties when they entered into the contract.[20]  If the parole evidence clears up the

ambiguity, the Court will then declare the now-clarified meaning of the contract.  If the

ambiguity persists despite the admission of parole evidence, the Court, as a last resource, will

construe the contract against the party that chose the contract language.[21]

When interpreting a contract, the Court is not at liberty to re-write it.  A document should

always be construed in the light of common sense and commercial reasonableness.

Nevertheless, a court lacks the prerogative to improve the contract by framing a better or more

reasonable bargain.[22]  If a contract is otherwise enforceable, the Court's inquiry must be limited

to determining and enforcing the intent of the parties as expressed in the contract language.

Despite the complexity of Article XIII, the Court concludes that its meaning is clear.  As

an initial matter, Article XIII is in effect.  Section 13.01 stipulates that the Restrictive Covenant

applies "[d]uring the initial Term and any Renewal Term, if any, and so long as Tenant is

operating the Demised Premises as a full service supermarket…."   The Lease is in its original

---

[20]     The parties waived a jury.  As a result, any factual disputes relevant to the Lease's interpretation will be decided by the Court.

[21]     The Court would not, in this case, construe the language of the restrictive covenant against either Redner's or Joppatowne.  Although the basic structure of Article XIII was borrowed from a Redner's lease, the provision was heavily negotiated, with both parties contributing language.   One cannot say, therefore, that either Redner's or Joppatowne was the drafter of Article XIII.

[22]     Because Maryland is a "blue pencil" state, courts may modify an unreasonable restrictive covenant instead of striking it down.  This power is limited to restrictive covenants in employment contracts, however.

Term and Redner's is operating a full service supermarket at Joppatowne.  Hence, Article XIII applies.[23]

Article XIII applies even though Joppatowne, as Landlord, does not itself operate any of the retail stores or stalls that Redner's claims violate the Restrictive Covenant.  Section 13.01 provides that Landlord "shall not lease to, use, or permit to be used or otherwise allow any portion of the Shopping Center … to be used [in a prohibited manner]."  JTF is a tenant of Joppatowne, and the stores and stalls are operated by JTF's subtenants.  Article XIII obligates Joppatowne to take measures, including the filing of suit, to terminate any prohibited use. Joppatowne has taken no measures to enforce Article XIII against either JTF or the subtenants.

### a.  Section 13.01(a): Use Covenant

Section 13.01(a)(i) prohibits four competing uses:  "a food supermarket, butcher shop, seafood shop, or 'grocery store.' "[24]  Two of those terms, butcher shop and seafood shop, are not specifically defined in the Lease.[25]  According to Merriam-Webster,[26] a "shop" is a "building or room stocked with merchandise for sale: store."  The secondary definition, focusing on the older word, "shoppe," is "a small retail establishment or a department in a large one offering a

----

[23]     Joppatowne contends that Redner's cannot enforce the restrictive covenant because it is in default in paying percentage rent.  As is explained in Part V(c) infra, Redner's is not in default because it owes no percentage rent on gasoline sales.

[24]     The last sentence of subsection 13.01(a)(i) is irrelevant to this controversy.  That sentence begins: "Notwithstanding anything herein to the contrary, the restriction on other lands within five (5) miles shall prohibit…."

[25]     The Court discusses the terms butcher shop and seafood shop in Part VI(b) of this opinion, which deals with the exceptions to the Restrictive Covenant.

[26]     All of the dictionary definitions in this Opinion are from the most current version of Merriam-Webster, which can be found online at www.merriam-webster.com/dictionary (last visited Jan. 8, 2013).

specified line of goods or services."  The dictionary gives as examples "a millinery shop" and "a sandwich shop."  The relevant dictionary definition of "butcher" is "a person who slaughters animals or dresses their flesh," or "a dealer in meat."  "Seafood" is defined as "edible marine fish and shellfish."

We now turn to the other two terms.  In common parlance, "grocery store" and "food supermarket" have different connotations.  In Great Britain, the noun "greengrocer" connotes a small shop selling fruits and vegetables.  In the United States, the noun "grocery" retains to a degree the old association with smallness and produce; the produce section in a supermarket is sometimes referred to as the "grocery section." [27]  The Lease, however, does not differentiate between a "food supermarket[s]" and a "grocery store."  Both terms have the exact same definition.[28]  Because "food supermarket or grocery store" is a defined term, the Court must use the Lease's definition.  A use that might fit the common understanding of these terms is not prohibited unless that use fits within one of the four definitions laid out in section 13.01(a)(ii)(1)–(4).[29]

Turning to the four definitions of "food supermarket or grocery store," the Court will consider each in its turn.  Section 13.01(a)(ii)(1) defines the term to include a Super Wal-Mart, a

---

[27]     That association has become blurred, however, as the typical small grocery store has morphed into the supermarket.

[28]     Section 13.01(a)(ii) provides that "[f]or purposes of interpretation, the phrase 'food supermarket or grocery store' means…."

[29]     When "grocery store" first appears in section 13.01 (a)(i), the term is set apart by internal quotation marks: "food supermarket, butcher shop, seafood shop, or 'grocery store.'"  When used in section 13.01(a)(ii), the term "grocery store" is twice set apart by internal quotation marks and once without such marks.  The Court does not ascribe any interpretive significance to this punctuation; both "food supermarket" and "grocery store" are defined identically in the Restrictive Covenant.

Super Target, or "other big box combo" that includes, as part of its operation, either a "food supermarket or 'grocery store.'"  This definition reflects the fact that large stores, in an effort to be all things to all people, now sell a variety of items that in earlier times would have been found in a specialty store.  Big box stores have pharmacies, flower shops, no-appointment medical clinics, and a food section that would dwarf many neighborhood supermarkets.  Large pharmacies are apothecaries no longer; they sell toys, cosmetics, DVDs, video games, and even auto parts.

The Lease reflects the fact that although Redner's would welcome the power of a big box store to draw people to the shopping center, it wanted to guard itself against a Trojan Horse containing a competitive supermarket or grocery store.[30]  Section 13.01(a)(ii)(1) does not apply to the instant case.  Neither JTF nor any of the stores or stalls in the Amish Farmer's Market qualifies as a "big box combo" akin to a Super Wal-Mart or a Super Target.

The Court next turns to section 13.01(a)(ii)(2).  The first order of business is to address the term "retail operator," which appears in subsections (2), (3), and (4).  Each of the three subsections begins, "any retail operator in the Shopping Center whose Gross Floor Area is…."  Subsection (2) applies to a retail operator whose Gross Floor Area is 15,000 square feet or less.  Subsection (3) applies to a retail operator whose Gross Floor Area is more than 15,000 but less than 30,000 square feet.  Subsection (4) applies to a retail operator whose Gross Floor Area is more than 30,000 square feet.

---

[30]    As stated, when Redner's signed the Lease, a large space in the shopping center was vacant.

There are only two candidates for the appellation "retail operator:" JTF and JTF's subtenants in the Amish Farmer's Market.  When applying the Restrictive Covenant, there is logic in viewing the Amish Farmer's Market as a single retail operation.   Physically, the Amish Farmer's Market is an enclosed area that is fenced off from the Flea Market.  Most of the stalls in the Market are run by members of the Amish community, and the Market seeks to convey an overall Amish theme.  Viewed as a whole, the Amish Farmer's Market has the appearance of a grocery store.  A number of the stalls resemble typical grocery store departments.

If the Amish Farmer's Market were viewed as a single retail operation, subsection (4) would apply because the enclosed Market area comprises more than 30,000 square feet.  The Court cannot take such an approach, however, because the Restrictive Covenant bases the definitions of "food supermarket or grocery store" on the term "retail operator."  As will be discussed, JTF cannot be considered a "retail operator;" only the individual stall owners meet that definition.

According to Merriam-Webster, "retail" means "to sell in small quantities directly to the ultimate consumer" or "to sell at retail."  An operator is "one that operates, as: one that operates a business."  Hence, a retail operator runs a business that sells in small quantities directly to the ultimate consumer.  JTF cannot be shoehorned into this definition.  JTF is an LLC that has one employee, Miller.  JTF leased space from Joppatowne.   JTF "subleases" the Market area to the entities (all of which appear to be LLCs) that do, in fact, operate the retail stalls and stores.[31]

_____

[31]     JTF's contract is with Menno Beiler, who operates Beiler's BBQ.  Although at trial Miller characterized the short, informal document as a license, it is a sublease.  The term of the sublease is five years.  Beiler, in turn, has a handshake arrangement with each of the Amish stall proprietors.  Although

Although JTF furnishes electricity, it in no sense manages or operates the stalls in the Market area.

The term "retail operator" can only apply to the individual stall proprietors. The Amish Farmer's Market is not a legal entity. Each stall is separately managed by a separate proprietor that operates under a separate business license from the State of Maryland.[32]   Each proprietor has a separate cash register or credit card reader. Each arranges its own labor, pays its own taxes, purchases its own inventory, and operates its stall as it sees fit. A stall cannot have two operators. If the choice is between JTF and the proprietors that actually operate the retail businesses, the choice is obvious.

Because "retail operator" refers to the tenants of the Amish Farmer's Market, only section 13.01(a)(ii)(2) applies.[33]  Because the subsection is complicated, it bears quoting in full:

> [A]ny retail operator in the Shopping Center whose Gross Floor Area is 15,000 square feet or less and whose in-store sales areas offering canned foods, fresh-baked bakery items; baking ingredients; fresh or frozen meats, and deli items; fresh uncooked fruits and vegetables; ice cream, frozen vegetables and frozen prepared foods; milk and milk products, butter, eggs, and cheese; and pet foods

JTF's sublease is with Menno Beiler, the parties have never suggested that he is a retail operator of anything other than his stall.

[32]      Most, if not all, of the stalls are operated by an LLC.

[33]      Joppatowne argues that it is illogical to apply this subsection to stalls whose Gross Floor Areas are on the order of 1,000 square feet. The definitions of food supermarket and grocery store were written to cover substantial retail operations rather than small stalls, it maintains. While this argument has appeal, it contradicts the clear and unambiguous language of subsection (2). Had the parties intended to exempt very small retail operators, they could have done so by setting a floor, such as "less than 15,000 square feet but greater than 1,000 square feet." They did not do so. Moreover, section 13.01(b)(ii) softens the impact of subjecting the stall owners to the complexities of subsection (a)(ii)(2) by specifically permitting, regardless of size, a number of retail uses such as ice cream shops, candy stores, and "restaurants of any kind."

that exceed, in the aggregate, twenty-five percent (25%) of such retail operator's
Gross Floor Area, or….

The Lease fails to define either "Gross Floor Area" or "in-store sales areas."  These definitions

matter because applying this subsection requires three distinct steps for each of the stalls.   First,

one must determine the stall's "Gross Floor Area."  Second, for each stall, one must calculate the

"in-store sales areas" devoted to the enumerated merchandise.  Third, for each stall, one must

calculate whether its "in-store sales areas" exceed, in the aggregate, 25% of the "Gross Floor

Area."

The Court cannot accomplish these three steps based on the record as it now exists.  Each

side hired an architect, but the architects' calculations, which were based on conflicting

interpretations of the pertinent terms, disagree.[34]  The record, therefore, must be developed

further.  As is explained infra, the Court was able to determine whether or not most of the stalls

violate the Restrictive Covenant without undertaking the three-step analysis.  With respect to

three of the stalls, the Court will refer the case to a United States Magistrate Judge for a Report

and Recommendation determining  which, if any, fall within the definition of  a "food

supermarket or grocery store" under section 13.01(a)(ii)(2).[35]

---

[34]      For instance, Joppatowne based its square footage calculations on the assumption that section
13.01(a)(ii)(4)(more than 30,000 square feet) applies.  Hence, Joppatowne instructed its architect to view
the Amish Farmer's Market as a single retail operation.  To calculate the "in-store sales areas," the
architect excluded the common areas, including the aisles between the stalls where customers walk and
browse, and the areas behind the counters where employees stand while waiting on customers.  The
architect also excluded stalls that Joppatowne considered to be covered by the exceptions to the
Restrictive Covenant found in section 13.01(b)(ii).  After fine tuning, the architect concluded that the "in-
store sales areas" of the stalls in the Amish Farmer's Market did not exceed in the aggregate 6,000 square
feet.  Even if section 13.01(a)(ii)(4) applied, these measurements are over-generous to Joppatowne.
[35]      The three stalls are Beiler's BBQ, Beiler's Baked Goods, and King's Cheese & Deli.

To guide the Magistrate Judge in this task, the Court makes the following findings as to the terms "Gross Floor Area" and "in-store sales areas." Although there are no dictionary definitions of these terms, their meaning can be reasonably determined by applying the facts of this case to the language of the Lease. First, the Court will address "Gross Floor Area." As commonly conceived, a store has perimeter walls that encompass its gross floor area. The vendors in the Amish Farmer's Market operate from stalls that are not bounded by perimeter walls on all four sides. The vendors pay rent based on the square footage of their individual stalls. Except for All Fresh Seafood & Produce, the vendors share rent for the common areas of the Market, such as the main aisles and seating areas. When applying "Gross Floor Area," the Magistrate Judge should use the area of the vendor's individual stall. A stall operator's Gross Floor Area does not include any of the common areas on which he pays rent. [36]

The Court next turns to "in-store sales areas." The parties agree that display cases and shelving should be counted. Taking a more expansive view of the term, Redner's would include additional areas such as counter space used for cash registers and the floor area on opposite sides of a display case where customers and employees stand while discussing merchandise. There is logic in Redner's reading. Nevertheless, the Court agrees with Joppatowne's more restrictive interpretation that holds the line at spaces within a stall that display merchandise.

Several factors support a narrow reading of the term. First, section 13.01(a)(ii)(2) does not use the term in the abstract, but refers specifically to "in-store sales areas offering" certain

---

[36]   The floor space of each stall should not be artificially increased by adding common area square footage. Tenants often pay rent on common areas and amenities (e.g., a lobby or parking lot) that benefit all of the retailers. Paying rent on these areas does not annex them to the retailer's individual space.

enumerated items.  The verb "offer" means "to present for acceptance or rejection."  The only areas in the stalls that actually "present" merchandise to the customers are the display cases, shelves, and racks where the merchandise is on view.[37]  Additionally, defining "in-store sales areas" restrictively avoids speculation as to what in addition to display areas the term might include.  During trial, the parties debated, stall by stall, whether sinks, prep tables, employee work space, and a host of other areas visible to customers should be counted.  Although the term "in-store sales areas" clearly includes the display areas, the Lease offers no guidance for including or excluding other areas from this definition.

### b.  Section 13.01(b): Exceptions to Use Covenant

Determining whether a stall is prohibited under section 13.01(a) does not end the inquiry.  A stall that fits the definition of "food supermarket or grocery store" is permitted if it falls within one of the "safe harbors" in section 13.01(b)(ii), "Exceptions to Use Covenant."  The exceptions trump the restrictions.  If a use falls under subsection (b)(ii), it is categorically permitted even if it would otherwise be prohibited under subsection (a).[38]  This result is mandated by the clear, peremptory language chosen by the parties.  Section 13.01(b)(ii) begins with the injunction, "Notwithstanding anything to the contrary contained herein:"  Subsection (b)(ii) begins with an equally peremptory clause:  "The use covenant set forth in Subsection 13.01(a) above shall not

---

[37]     Manufacturers battle to increase the "shelf space" in a supermarket devoted to their products.

[38]     Under subsection (b)(i), the Restrictive Covenant applies only so long as Redner's is operating a food supermarket at Joppatowne and "only so long as no Default has occurred and is continuing."  Joppatowne maintains that Redner's has defaulted in its obligation to pay percentage rent on sales of gasoline and incidentals (snacks primarily) at small gas station that Redner's opened after the Lease began.  As discussed in Part V(c) supra, the Court has rejected this argument.  Accordingly, Redner's is not in default under the Lease.

preclude Landlord from leasing space to others or to other occupants of the Shopping Center

from using their respective premises, for, among other uses …."[39]

Next, we turn to the enumerated permitted uses, which are:

- a table service delicatessen (i.e., providing at least one-half (1/2) of its leasable floor space exclusive of office and stock room for tables and chairs),

- a convenience store,

- a candy store,

- restaurants of any kind,

- a packaged goods store,

- ice cream shops and/ or ethnic or specialty food stores,[40]

- pet stores,

- vitamin stores,

- dollar stores,

- video stores, or

- specialty coffee stores.[41]

------------------------

[39]     The quoted language ends with the words "among other uses." This phrase is somewhat confusing because it suggests that the permitted uses specified in subsection (b)(ii) are examples that fit within a general category of permitted uses. Such a reading would be incorrect. Subsection (b)(ii) does not create a general, broadly defined category of permitted uses. Either a use falls within one of the enumerated "safe harbors" or it does not. The Court interprets the words "among other uses" to mean that subsection (b)(ii) is not intended to be an all-inclusive listing of the uses that the lease permits. For example, a tobacco shop would be permitted even though it is not on the safe harbor list.

[40]     Ice cream shops fall within the exceptions to the Restrictive Covenant. Nevertheless, sales of ice cream count towards the 25% in-store sales area calculation under subsection 13.01 (a)(ii)(2).

[41]     Subsection (b)(ii) ends: " … nor shall it prohibit the uses of other existing tenants of the Shopping Center (and their successors, assigns, subtenants and replacements) …."  This language is not at

Section 13.01 includes a third subsection, subsection (c), "Clarification of Exceptions to Use Covenant."  Subsection (c) provides that the exceptions described in subsection (b) cannot be construed to permit a tenant to sell "frozen foods or dairy products from an unlimited quantity of coolers, freezers, or cases…."   The operative language reads as follows:

> … in furtherance thereof, the Landlord covenants that no such occupant shall sell frozen foods or dairy products from more than (12) lineal feet of space in such premises as long as Tenant is operating a food supermarket and/or using the Demised Premises for the sale of food or food products….

Section 13.01(b) raises a number of issues.  The first involves subsection (c).  What is the outcome if a stall that is not prohibited under section 13.01(a)(ii)(2) has more than twelve lineal feet of freezer space devoted to frozen foods or dairy products?  Stated otherwise, does subsection (c) operate as a separate, overriding restrictive covenant barring any occupant from violating the twelve lineal foot limitation?  Or, does subsection (c) apply only to uses that are enumerated in section 13.01(b)(ii)?  If the former interpretation holds, then an occupant that is neither butcher shop, seafood shop, grocery store, nor food supermarket would be prohibited from violating the twelve lineal foot limitation.  If the latter proposition holds, then the twelve lineal foot limitation would apply only to an occupant that required the safe harbor of subsection (b)(ii) to avoid proscription under subsection (a).

The Court finds that subsection (c) does not create a separate, overriding restrictive covenant.   Its title, "Clarification of Exceptions to Use Covenant" limits its application to the exceptions.  Its text straightforwardly links its application to the exceptions:  "in furtherance of

---

issue in this case because the subtenants of the Amish Farmer's Market were not "existing" when the Lease began.

[subsection (b)], the Landlord covenants that…."  Anyone reading Article XIII would expect to find all of the use covenants in section 13.01(a), "Use Covenant."

The second issue involves the definition of "specialty food stores."   This issue has two parts.  First, Joppatowne contends that butcher shops and seafood shops, although expressly forbidden in subsection (a)(i), fall within the safe harbor of subsection (b)(ii) because they are "specialty food stores."  This argument fails.  It would be illogical to read the Lease as permitting in subsection (b) two uses that are expressly disallowed in subsection (a).  Moreover, in contract construction, specific terms such as butcher shop and seafood shop are presumed to take precedence over more general terms, such as "specialty store."  See, e.g., Heist v. Eastern Sav. Bank, FSB, 884 A.2d 1224, 1228 (Md. Ct. Spec. App. 2005).

Finally, although "specialty store" is not defined in the lease, it has connotations that simply do not apply to a typical butcher or seafood shop.[42]  Although with misgivings, the Court turns to the internet for common usage.  A good working definition of the term "specialty store" is a small store that specializes in a specific range of merchandise and related items and provides a high level of service and expertise.  Wikipedia, Specialty store, http://en.wikipedia.org/wiki/Specialty_store (last visited Jan. 8, 2013).  A store that exclusively sells cell phones or video games would be considered specialized as would a store that specializes in leather goods, handmade toys, or imported candy.[43]

---

[42]  Under the right facts, a butcher shop or a seafood shop might qualify as a "specialty food store."  In this case, however, the Court must apply the term to the stalls in the Market as they existed at trial.

[43]  The Court recognizes that the term "specialty store" has no precise meaning.  That term can only be stretched so far, however.  Whatever the outer boundaries of "specialty" may be, "specialty food store"

The third issue involves the term "ethnic food stores."  According to Merriam-Webster, "ethnic" means "of or relating to large groups of people classed according to common racial, national, tribal, religious, linguistic, or cultural origin or background."  The Amish qualify under this definition because of their distinctive shared religion and culture.[44]  The more relevant question, which the Court will address infra, is whether the Amish have a distinctive ethnic cuisine.  An ethnic food store must sell ethnic food.[45]  A food store does not become ethnic just because it is owned and operated by members of an ethnic group.  An ethnic food store would not lose that status because it is owned and operated by people of no specific ethnicity.[46]

Having addressed Article XIII, the Court will next turn to the stalls and stores that Redner's accuses of violating the restrictive use covenant.

### c.   The Amish Farmer's Market Stalls

### 1.   All Fresh Seafood & Produce

As mentioned, All Fresh, which is owned and managed by John Walters and Mary Roth, is located outside the Amish Farmer's Market enclosure.  The stall, which is laid out in a

---

cannot encompass All Fresh and Lapp's Fresh Meats.  These stalls make no pretentions towards uniqueness, sophistication, or special expertise.  Without intending to demean these businesses, the Court concludes that they are typical seafood and butcher purveyors of the type found in a typical large supermarket.

[44]      The Amish may share the same racial and national heritage with other Caucasian Americans.  The religious and cultural beliefs and practices of people who identify themselves as Amish are not monolithic.  Nevertheless, the Amish fit within the definition of an ethnic group as that term is commonly understood.  The parties did not seriously dispute this proposition.

[45]      The adjective "ethnic" modifies "food."

[46]      A generic hot dog does not become an ethnic food because the people who sell it are members of a particular ethnic group.  Thai green curry does not lose its ethnic status because it is sold by a non-Thai family.

rectangle, comprises approximately 1,000 square feet.[47]  Depending on how one counts, the stall includes approximately ten display tables, cases, and coolers.  Customers can move freely among the display areas.

All Fresh sells fresh and frozen seafood as well as fresh fruits and vegetables.  A large sign on the back wall states, "'All Fresh' Quality Seafood & Produce."  Below it, another large sign states, "Seafood."  The photographs admitted into evidence show smaller signs stating, "Lobster Tails," "Scallops," "Crab Pretzels," and "Sno Crabs."  Pl.'s Trial Ex. 17 (Photo Nos. 2412 and 2413).  The Court finds that All Fresh is a "seafood shop" within the intendment of section 13.01(a)(i).  A seafood shop is no less a seafood shop merely because it also sells fresh produce.  Hence, All Fresh violates the Restrictive Covenant in Redner's Lease.[48]

### 2.  Lapp's Fresh Meats

From a stall that comprises approximately 1,000 square feet, Lapp's Fresh Meats ("Lapp's") sells fresh and frozen meats.  Lapp's sells pre-packaged meats and meats that are cut to order.  The stall is laid out as a rectangle, with a single long refrigerated display case across its face.  Laid out in the display case are cuts of meat and meat items such as sausages.  Behind the display case is a work area that includes a meat grinder, a sausage stuffer, a band saw, and two slicers.   Lapp's employees use this equipment to cut 20 to 25-pound sections of beef and pork into retail-sized portions.  Upon request, Lapp's will also slice a cut of meat to order.  A large sign on the wall behind the counter reads, "Lapp's Fresh Meats, LLC."  Other messages on the

---

[47]     The parties' square footage calculations differ slightly.
[48]     Because All Fresh is prohibited as a seafood shop, the Court need not determine whether its "in-store sales areas" devoted to fresh, uncooked fruits and vegetables exceed 25% of its "Gross Floor Area."

sign include: "Steaks · Hamburger · Pork Chops," "Frozen Packages!" and "Fresh Cut!" Def.'s Trial Ex. 36 (Photo No. 60).

Based on these facts, the Court finds that Lapp's Fresh Meats is clearly a "butcher shop" within the intendment of section 13.01(a)(i) of the Lease.[49] Lapp's does not fall within the safe harbor of section 13.01(b)(ii); it is not an "ethnic or specialty food store" and Ruth's Grill, the small grill at one end of the meat counter, does not turn Lapp's into a "restaurant."[50] Def.'s Ex. 36 (Photo Nos. 57–59. Accordingly, Lapp's Fresh Meats is a use that violates the Restrictive Covenant.

### 3. Dutch Pantry Fudge

Owned and operated by Steve Stoltzfus, Dutch Pantry Fudge ("Dutch Pantry") has three small stalls in the Amish Farmer's Market. Two of the stalls (referred to as Dutch Pantry A and Dutch Pantry B) are located side-by-side in one corner of the enclosure. A large sign that demarks both A and B reads, "Dutch Pantry Fudge: Bulk Foods and Candy." Def.'s Trial Ex.

---

[49] The Court rejects Joppatowne's argument that the Lease is ambiguous because it proscribes butcher shops but would permit a limited quantity of "fresh or frozen meats" to be sold. The three pertinent definitions of "food supermarket or grocery store" in sections 13.01(a)(ii)(2)–(4) include "fresh or frozen meats" among the enumerated items that count under the 25% "in-store sales area" calculation. The Court finds that the Lease, as applied to Lapp's Fresh Meats, is not ambiguous. Lapp's Fresh Meats deals only in meat, and it meets any reasonable definition of a butcher shop.

[50] Lapp also operates Ruth's Grill, which is a separately signed area at one end of the long meat counter. On the wall behind the counter is a large menu. Def.'s Trial Ex. 36 (Photo Nos. 57 and 59). Ruth's Grill sells hot foods including breakfast sandwiches, pork chops, side dishes etc. Redner's does not contend that Ruth's Grill violates the Restrictive Covenant. Redner's has never contended that fast food outlets, restaurants, or other places selling prepared food designed to be eaten on the premises or as "take out" violate the Restrictive Covenant. Moreover, Ruth's Grill falls within the "restaurants of any kind" safe harbor of section 13.01(b)(ii). The fact that Ruth's Grill is a permitted use does not make Lapp's Fresh Meats any less a butcher shop.

36 (Photo No. 42).  The third stall (Dutch Pantry C) is located across an aisle from the other two.

The photos introduced into evidence do not show a separate sign for C except for a small wall

sign instructing customers to "Please pay for Candies at Fudge Counter."  Def.'s Trial Ex. 36

(Photo No. 44).  Because each stall sells different items, the Court will consider each separately.

Dutch Pantry A sells homemade fudge (about 20 different types), chocolate, candy

apples, caramel apples, fudge apples, chocolate covered pretzels, fudge pretzels, and chocolate

covered bacon and fruit.  Dutch Pantry A does not violate the Restrictive Covenant.  First, none

of the items it sells are enumerated in subsection 13.01(a)(ii)(2).  Hence, the store does not meet

the definition of "food supermarket or grocery store."  Even if it did, Dutch Pantry A would fall

within the safe harbor of section 13.01(b)(ii) as both a "candy store"  and a "specialty food

store."

The same analysis applies to Dutch Pantry C, which sells only candy.   Dutch Pantry B

presents a more difficult question, however.   Dutch Pantry B, which comprises roughly 500

square feet, is rectangular in configuration.  According to Joppatowne's diagram, one side of the

rectangle is open, allowing customers to walk inside.  The interior of the stall includes perimeter

and free standing shelving.  According to Menno Beiler, the shelves offer candy, snack foods,

drinks, and dry bulk foods.

The photos of Dutch Pantry B provide a more detailed (although not exact) picture of the

merchandise on offer.  Def.'s Trial Ex. 36 (Photo Nos. 42, 55 and 56).  Most of the merchandise

consists of candy, chips, cheese puffs, snacks, and other "junk food" items that one finds in a

typical convenience store.  A substantial portion of the shelving displays individual clear plastic

containers of what appears to be trail mix, nuts, dried fruit, and other healthier snack food.  The

pictures also show jars containing what appears to be juice, salsa, and pickles.  Finally, one shelf includes small sealed bags whose contents are indiscernible.

The Court finds that Dutch Pantry B does not run afoul of the Restrictive Covenant.  The trial record cannot support a finding that Dutch Pantry B is a "food supermarket or grocery store."   Few, if any, of the items it sells are among the items enumerated in section 13.01(a)(ii)(2).   Redner's seems to be offended most by Dutch Pantry B's substantial offering of nuts, trail mix, and other "bulk" items often found in a grocery store like Whole Foods.  None of these items, however, are listed in subsection (a)(ii)(2).  The Court must apply the Restrictive Covenant as it is written.

### 4.  Kreative Kitchen

Operated by Jacob and Kay Stoltzfus, Kreative Kitchen sells homemade potpies, soups, salads, sandwiches, wraps, and made-to-order subs.  The Kreative Kitchen stall (roughly 780 square feet) is demarked by a sign announcing "Kreative Kitchen:  Homemade Pot Pie · Soups · Salads · Subs · Deserts."   Pl.'s Trial Ex. 27 (Photo No. 458).   A large menu board hanging behind the counter lists 17 items on the bill of fare.  Def.'s Trial Ex. 36 (Photo Nos. 49 and 52). Menno Beiler testified that about half of the food sold at Kreative Kitchen is carried out and half is eaten in the Market's seating area.  Kreative Kitchen does not violate the Restrictive Covenant. Even if it were prohibited under subsection (a)(ii)(2), which it is not, Kreative Kitchen would fall within the safe harbor applicable to "restaurants of any kind."

### 5.  Dutch Delights

Owned and operated by Mervin Stoltzfus,  Dutch Delights sells funnel cakes, handrolled pretzels, and various types of  homemade "logs," which are made from pretzel dough stuffed with various types of meats, including hot dogs, cheesesteaks, chicken, bacon, ham, and ribs. Joint Trial Ex. 26 (Photo No. 2391).  Dutch Delights also offers ice cream cones scooped from containers in two small refrigerated cases located near the end of its counter.  According to Menno Beiler, most of the food prepared by Dutch Delights is consumed at the Amish Farmer's Market.  Joppatowne and Redner's agree that Dutch Delights is a "food court style operation." As such, it does not violate the Restrictive Covenant.

### 6.  Beiler's BBQ

Operated by Menno Beiler, Beiler's BBQ sells various cuts of fresh, raw chicken, and prepared food, including baked beans, string beans, bread, mushrooms, rotisserie potatoes, and barbequed chicken and ribs.  Although the photo of Beiler's sign is partially obscured, it apparently reads, "Beiler's Bar-B-Que · Pork · Beef · Chicken."  Def.'s Trial Ex. 36 (Photo No. 28).  Beiler's rectangularly shaped stall comprises roughly 1,050 square feet.  The stall is situated between Dutch Delights and Dutch Pantry Fudge, and its counter is flush with theirs.  The BBQ's counter is divided into three sections.  The middle section includes three cash registers. Def.'s Trial Ex. 36 (Photo No. 32).  The end sections consist of display cases.  One case is heated and offers prepared food such as barbequed chicken.  Def.'s Trial Ex. 36 (Photo No. 31).  The other is refrigerated and offers fresh, uncooked chicken.  Joint Trial Ex. 26 (Photo No. 2411).

Unlike Lapp's Fresh Meats, Beiler's BBQ is not proscribed by section 13.01(a)(i) as a "butcher shop."   The stall, therefore, violates the Restrictive Covenant only if it is a "food

35

supermarket or grocery store."  Of the items enumerated in section 13.01(a)(ii)(2), only "fresh or

frozen meats" applies.  The pertinent question is whether 25% of the stall's "in-store sales area"

is dedicated to the sale of fresh, uncooked chicken.  This is a question that the United States

Magistrate must decide.  If the Magistrate Judge determines that Beiler's BBQ is prohibited

under subsection (a)(ii)(2), it is not saved by any of the safe harbors in subsection (b)(ii).  While

Beiler's BBQ sells prepared food in substantial quantities, it cannot be characterized as a

"restaurant of any kind."[51]  The portion of Beiler's operation dedicated to the sale of fresh,

uncooked chicken is simply too significant to view the stall as a restaurant.  Moreover, Beiler's

BBQ does not come within the definition of an "ethnic or specialty food store."  The foods that

Beiler's sells do not claim to be foods characteristic of the Amish.  Barbequed and fresh chicken

are not the type of unique, high quality, specialized foods associated with a specialty store.

### 7.  Beiler's Baked Goods

Beiler's Baked Goods makes and sells homemade pies, cakes, whoopee pies, sticky

buns, and pastries.[52]  In addition to baked goods, the stall also sells freshly made coffee.  Beiler's

area is demarked by a wall sign that reads, "Beiler's Baked Goods:  Coffee & Donuts."  The sign

depicts various pastries and cups of coffee.  Because Beiler's bakes its wares on site, much of the

stall's interior space is taken up by ovens, walk-in freezers, baking prep tables, shelves, and other

kitchen equipment.  The stall is rectangular in shape and open to customers on two sides.

Flanking one of the open sides is a detached U-shaped shelving unit.  Running the length of the

---

[51]     Menno Beiler estimates that about 90% of his profits come from prepared food, not fresh chicken.
This fact does not change the outcome; it is the nature of the operation that counts.

[52]     As mentioned, Beiler's Baked Goods is owned and operated by a relative of Menno Beiler.

other open side is a long counter containing display cases.  Def.'s Trial Ex. 36 (Photo Nos. 12–14).

With respect to section 13.01(a), the analysis of Beiler's Baked Goods tracks that of Beiler's BBQ.  A bakery is not a prohibited use.  "Fresh-baked bakery items," are one of the enumerated items in subsection (a)(ii)(2).  Accordingly, the United States Magistrate Judge will determine whether the in-store sales area dedicated to these items is 25% of the stall's gross floor area.  Like Beiler's BBQ, Beiler's Baked Goods is not protected by a subsection (b)(ii) safe harbor.  Even though Beiler's Baked Goods sells coffee, and customers may eat their pastries at the Market, the primary character of the stall is a bakery not a "restaurant of any kind."   The "ethnic or specialty food store" exception also does not fit.  The baked goods do not claim to be characteristic foods of the Amish.  Nor are the bakery's wares the high quality, unique, specialized items of a specialty store.

### 8.   King's Cheese & Deli

Operated by Reuben King, King's Cheese & Deli ("King's") sells milk and dairy drinks, a variety of cheeses and cheese spreads, pickles, homemade popped rice, eggs, milk and other drinks, cold cuts, deli meats, smoked meats, beef sticks, various canned items and jams.  King's Cheese abuts the back wall of Beiler's Baked Goods.  Display cases and shelves line three sides of the stall.  The interior of the stall houses a large walk-in refrigerator, a large office, and a prep area with sinks and slicers.  Two large signs mark the King's Cheese & Deli area.  The larger of the two reads, "King's Cheese & Deli Meats."  Two arrows direct customers towards "Cheese & Deli Meats" and "Milk, Eggs, Pickles & More."  The other sign includes the name of the stall

and a picture of a cheese wedge, a salami, and a sandwich.  Pl.'s Trial Ex. 18 (Photo Nos. 2397 and 2398).

The analysis used for Beiler's Baked Goods and Beiler's BBQ applies to King's as well. The Magistrate Judge will add up the square footage of the in-store sales area dedicated to "milk and milk products, butter, eggs, and cheese," "fresh or frozen meats or deli items," and "canned foods."  For purposes of applying the 25% test under subsection (a)(ii)(2), "canned foods" means food that is sealed and preserved in either a metal can or a glass jar.  "Fresh or frozen meats" is self-explanatory, but would not include jerky, beef sticks, or other cured meats.  "Deli items" include cold cuts, sliced cheese, and sliced deli meats.[53]

Like Beiler's Baked Goods and Beiler's BBQ, King's does not fit within any of the safe harbors recognized in subsection (b)(ii).  Given the wide variety of items it sells, King's is not an "ethnic or specialty food store."  Nor is King's a "table service delicatessen," because it does not "provid[e] at least one-half (1/2) of its leasable floor space, exclusive of office and stock room for tables and chairs." From the photographs, some of the glass jars in King's canned goods section appear to be home-preserved.  Arguably, these jars may create an association with rural life in general and with the Amish in particular.  When interpreting the Restrictive Covenant, the Court must view the store as a whole.  Moreover, the "ethnic food store" exception applies to the store as a whole and not to individual items within the store.  When applying subsection (a)(ii)(2), therefore, the Court cannot exempt individual canned foods that may have an ethnic association.

---

[53]     Some items may be included under more than one definition.

**VII.    Conclusion**

Although this opinion decides almost all of the claims and issues, several remain unresolved because further fact finding is required.  In a separate Order, the Court is referring the unresolved matters to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rules 301 and 302.

Dated this 24th day of January, 2013.

/s/

_____
Benson Everett Legg
Senior United States District Judge

**ADDENDUM**

**ARTICLE XIII.**      RESTRICTIVE COVENANTS.

    13.01   Landlord's Restrictive Use Covenant.

        (a)      Use Covenant.

           (i)      During the Initial Term and any Renewal Term, if any, and so long as Tenant is operating the Demised Premises as a full service supermarket, Landlord hereby covenants that it shall not lease to, use, or permit to be used or otherwise allow any portion of the Shopping Center or other lands now or hereafter owned by Landlord (or an affiliate thereof) which are located within five (5) mile radius of the Shopping Center (except for those locations, if any, set forth on Exhibit "D" attached hereto and made a part hereof) to be used as a food supermarket, butcher shop, seafood shop, or "grocery store". Notwithstanding anything herein to the contrary, the restriction on other lands within five (5) miles shall prohibit only a full service supermarket and not the other restrictions applicable to the Shopping Center.

           (ii)      For purposes of interpretation, the phrase "food supermarket or grocery store" means:

           (1)      a Super Kmart that includes a food supermarket or "grocery store", a Super Wal-Mart that includes a food supermarket or "grocery store", a Super Target that includes a food supermarket or "grocery store" or other big box combo that includes a food supermarket or "grocery store", or

           (2)      any retail operator in the Shopping Center whose Gross Floor Area is 15,000 square feet or less and whose in-store sales areas offering canned foods, fresh-baked bakery items; baking ingredients; fresh or frozen meats and deli items; fresh uncooked fruits and vegetables; ice cream, frozen vegetables and frozen prepared foods; milk and milk products, butter, eggs and cheese; and pet foods that exceed, in the aggregate, twenty-five percent (25%) of such retail operator's Gross Floor Area, or

           (3)      any retail operator in the Shopping Center whose Gross Floor Area is more than 15,000 but not more than 30,000 square feet and whose in-store sales areas offering canned foods, fresh-baked bakery items; baking ingredients; fresh or frozen meats and deli items; fresh uncooked fruits and vegetables; ice cream, frozen vegetables and frozen prepared foods; milk and milk products, butter, eggs and cheese; and pet foods that exceed, in the aggregate, twenty percent (20%) of such retail operator's Gross Floor Area, or

           (4)      any retail operator in the Shopping Center whose Gross Floor Area is more than 30,000 square feet and whose in-store sales areas offering canned foods, fresh-baked bakery items; baking ingredients; fresh or frozen meats and deli items; fresh uncooked fruits and vegetables; ice cream, frozen vegetables and frozen prepared foods; milk and milk products, butter, eggs and cheese; and pet foods that exceed, in the aggregate, six thousand (6,000) square feet of such retail operator's Gross Floor Area.

        (b) Exceptions to Use Covenant.  Notwithstanding anything to the contrary

contained herein:

(i)       The use covenant set forth in Subsection 13.01(a) above shall apply only during such time as Tenant is operating a food supermarket and/or using the Demised Premises for the sale of food or food products and only so long as no Default has occurred and is continuing.

(ii)       The use covenant set forth in Subsection 13.01(a) above shall not preclude Landlord from leasing space to others or to other occupants of the Shopping Center form using their respective premises, for, among other uses, a table service delicatessen (i.e., providing at least one-half (½) of its leasable floor space, exclusive of office and stock room for tables and chairs), a convenience store, a candy store, restaurants of any kind, a packaged goods store, ice cream shops and/or ethnic or specialty food stores, pet stores, vitamin stores, dollar stores, video stores or specialty coffee stores; nor shall it prohibit the uses of other existing tenants of the Shopping Center (and their successors, assigns, subtenants and replacements).

(c)       Clarification of Exceptions to Use Covenant.  The exceptions to the use covenant as set forth in Subsection 13.01(b) above shall not be construed so as to permit any such occupant from selling frozen foods or dairy products from an unlimited quantity of coolers, freezers, or cases and, in furtherance thereof, the Landlord covenants that no such occupant shall sell frozen foods or dairy products from more than twelve (12) lineal feet of space in such premises as long as Tenant is operating a food supermarket and/or using the Demised Premises for the sale of food or food products and only so long as no Default has occurred and is continuing; nor shall it prohibit the uses of other existing tenants of the Shopping Center (and their successors, assigns, subtenants and replacements).