IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

REDNER'S MARKETS, INC.,            *

    Plaintiff,                            *

        v.                               *                Civil Action No.: RDB-11-1864

JOPPATOWNE G.P. LIMITED            *
PARTNERSHIP,
                                    *

    Defendant.                            *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

The Plaintiff Redner's Markets, Inc. ("Plaintiff" or "Redner's") filed this action against its landlord Joppatowne G.P. Limited Partnership ("Defendant" or "Joppatowne"), alleging violations of a restrictive use covenant in a commercial lease. Redner's initially contended that by permitting a group of ten farmer's market stalls to operate at the Joppatowne Plaza Shopping Center, Joppatowne breached a covenant not to lease to any other grocery stores within a five-mile radius of the shopping center. On January 24, 2013, Judge Legg of this Court found that two of the challenged stalls infringed the restrictive use covenant while three other stalls did not. *See* Jan. 24, 2013 Mem. Op. 30-35, ECF No. 133. The case was thereafter reassigned to the undersigned, who has certified familiarity with the record pursuant to Rule 63 of the Federal Rules of Civil Procedure.[1]

---

[1] *See* May 23, 2013 Letter Order, ECF No. 155. In anticipation of Judge Legg's retirement from the United States District Court for the District of Maryland on February 6, 2013, this case was transferred to the undersigned on January 24, 2013.

1

This Court then scheduled a second stage of the bench trial for July 1 and 2, 2013, with the following issues remaining to be tried: (1) whether Joppatowne breached its restrictive use covenant as to the five farmer's market stalls for which Judge Legg rendered no opinion, and (2) whether Redner's is entitled to damages for lost profits caused by the infringing stalls. However, on the morning of trial on July 1, 2013, Redner's abandoned its breach of contract claim relating to four of the five remaining stalls.[2] As to the remaining stall, specifically Beiler's Baked Goods, Redner's maintained its claim of liability, but indicated that it would pursue only injunctive relief as to that stall. Accordingly, the pending issue of lost profits damages would pertain only to the two stalls for which this Court, per its Memorandum Opinion of January 24, 2013, already found liability.

The procedural posture in this case is as follows. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332, as Redner's is a Pennsylvania corporation and Joppatowne is a limited partnership and citizen of Maryland. *See* Am. Compl. ¶¶ 1-2, ECF No. 36. In addition, the amount in controversy exceeds $75,000. *Id.* Redner's originally filed this action in the United States District Court for the Eastern District of Pennsylvania on May 10, 2011. The case was transferred to this Court on July 7, 2011. On September 15, 2011, Redner's filed an Amended Complaint. *See* Am. Compl., ECF No. 36. The case involved issues of liability and traditional theories of damages—to wit, lost profits and lost sales.[3]

---

[2] Those stalls are Beiler's BBQ, King's Cheese & Deli, and the two "Vendor Stalls."

[3] As Judge Legg noted in Letter Orders during earlier stages of the case, there was some suggestion that a second stage of litigation, relating to "more esoteric damage theories (e.g., diminution of value; constructive trust)," might come into play, depending on the outcome of the bench trial on liability and traditional damages theories. Sept. 30, 2011 Letter Order, ECF No. 42. In light of this

In late 2011, a bench trial on the issues of liability and traditional damage theories commenced. The bench trial was conducted by Judge Legg over seven nonconsecutive days, from December 5, 2011 to August 14, 2012. On January 24, 2013, Judge Legg issued an opinion in which he resolved some of the issues presented at the first stage of trial and reserved some issues for report and recommendation by a United States Magistrate Judge. *See* Jan. 24, 2013 Mem. Op. 24-26; Order of Reference, ECF No. 135. After Joppatowne objected to Judge Legg's Order of Reference, the undersigned withdrew and vacated it. *See* May 16, 2013 Letter Order, ECF No. 154. Accordingly, the issues of liability and traditional damages that are identified as pending in the vacated Order of Reference remain outstanding and are decided by this Court herein.

After Judge Legg issued his Memorandum Opinion in which he found liability as to two stalls and found no liability as to three other stalls, Redner's filed a Motion for Permanent Injunction (ECF No. 141), seeking an order permanently enjoining Joppatowne from continuing to violate the restrictive use covenant. Specifically, Redner's asked that Joppatowne be required to cause the two infringing farmer's market stalls—All Fresh Quality Seafood & Produce ("All Fresh") and Lapp's Fresh Meats—to be removed from the Joppatowne Plaza Shopping Center. Applying Maryland law, this Court decided that a permanent injunction was warranted as to All Fresh and Lapp's Fresh Meats, because Joppatowne was found to have violated the restrictive use covenant and the equities favored Redner's. *See* June 13, 2013 Mem. Op. 10-12, ECF No. 158. Joppatowne moved to stay the

_____

Court's conclusion that Redner's has made no proof of monetary damages for lost profits caused by Joppatowne, as well as this Court's Order of Permanent Injunction (ECF No. 159) as to the two stalls found to infringe the restrictive use covenant, the issues of esoteric damage theories no longer have any bearing in this action. Accordingly, no trial will be held on those matters.

enforcement of the Permanent Injunction Order, and that motion was denied. *See* June 20, 2013 Letter Order, ECF No. 168; *see also* Fourth Circuit Order, ECF No. 169 (denying Joppatowne's motion for a stay of permanent injunction pending appeal).

A two-day bench trial on the remaining issues of liability as to Beiler's Baked Goods and traditional damages as to the infringing stalls, Lapp's Fresh Meats and All Fresh Quality Seafood & Produce, commenced on July 1 and 2, 2013. Redner's called two witnesses— Gary O'Brien, Vice President of Perishable Retail Operations for Redner's, who testified regarding lost profits allegedly caused by the infringing stalls; and architectural expert Jonathan McGowan, who testified to the gross floor area and in-store sales areas of the remaining challenged stall. Joppatowne called its expert architect Shellie Curry, as well as Robert E. Fowler, Esq., Joppatowne's corporate representative. Based on the exhibits introduced into evidence, the testimony of the four witnesses, the written submissions of the parties, and the oral arguments of counsel, this Court sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The accompanying Order enters Judgment in favor of Defendant Joppatowne G.P. Limited Partnership and against Plaintiff Redner's Markets, Inc. as to the remaining breach of restrictive use covenant claims. In addition, this Court finds that Redner's has failed to prove lost profits with reasonable certainty as to the two infringing stalls, Lapp's Fresh Meats and All Fresh Quality Seafood & Produce, and therefore awards no monetary damages. Accordingly, the Order and Judgment shall indicate the entry of Judgment in favor of the Plaintiff Redner's Markets, Inc. for injunctive relief as to Lapp's Fresh Meats and All

Fresh, with no monetary damages, and entry of Judgment in favor of the Defendant Joppatowne G.P. Limited Partnership as to all other challenged stalls.

## I. THIS COURT'S PREVIOUS FINDINGS OF FACT AND CONCLUSIONS OF LAW

The findings of fact and conclusions of law found by Judge Legg in his January 24, 2013 Memorandum Opinion are summarized herein, as they continue to govern this case.

### A. Previous Findings of Fact

Redner's Markets, Inc. ("Redner's" or "Plaintiff") operates a chain of grocery stores in Pennsylvania, Maryland, and Delaware. Jan. 24, 2013 Mem. Op. 1. On November 23, 2005, Redner's executed a twenty-year lease agreement ("the Redner's Lease") with Joppatowne G.P. Limited Partnership ("Joppatowne" or "Defendant"), the owner and manager of the Joppatowne Plaza Shopping Center, which is located in Joppatowne, Maryland at the intersection of Maryland Route 40 and Joppa Farm Road. *Id.* at 2. Article XIII of the Redner's Lease contains a restrictive use covenant, by which Joppatowne agreed not to lease any space at the Joppatowne Plaza Shopping Center or within a five mile radius thereof to be used as a food supermarket, butcher shop, seafood shop, or grocery store. *See* Redner's Lease § 13.01(a), Joint Trial Ex. 12.

This dispute arose when Joppatowne permitted an Amish farmer's market and other food stalls to lease space at the Joppatowne Plaza Shopping Center. Jan. 24, 2013 Mem. Op. 4. The Amish farmer's market, which opened on March 17, 2011, contains seven stalls inside an enclosure, which are loosely organized and headed by Menno Beiler ("Beiler"). *Id.* The seven stalls, which are separately owned and operated, are Dutch Delights; Dutch Pantry Fudge; Kreative Kitchen; Lapp's Fresh Meats; King's Cheese & Deli; Beiler's BBQ;

and Beiler's Baked Goods.  *Id.* at 5.  An eighth stall, All Fresh Quality Seafood & Produce ("All Fresh"), which is not associated with the Beiler group, is located outside the enclosure. *Id.*  There are two other food stalls (the "Vendor Stalls") located outside the enclosure, which were also challenged by Redner's.  *Id.*

B.    Previous Conclusions of Law

Judge Legg found that Joppatowne had breached the restrictive use covenant by leasing space to All Fresh and Lapp's Fresh Meats.  *See id.* at 30-32.  Under the Redner's Lease, All Fresh constituted a seafood shop and Lapp's Fresh Meats was a butcher shop.  *Id.* However, three other stalls were found not to violate the restrictive use covenant.  First, Dutch Pantry Fudge, which Judge Legg found to be divisible into three sub-stalls, did not violate the restrictive use covenant.  *Id.* at 32-34.  Likewise, Kreative Kitchen and Dutch Delights did not fall within the prohibited uses of the restrictive use covenant.  *Id.* at 34-35.

As to five remaining stalls—Beiler's BBQ, Beiler's Baked Goods, King's Cheese & Deli, and the two Vendor Stalls—Judge Legg set forth a three-step analysis that should be applied to determine whether each stall breached the restrictive use covenant.  *Id.* at 24. Section 13.01(a)(ii)(2) defines a retail operator, for purposes of the restrictive use covenant, as one whose "Gross Floor Area is 15,000 square feet or less" and whose "in-store sales areas" offering specifically enumerated goods[4] exceed twenty-five percent of the Gross Floor Area.  *See* Redner's Lease § 13.01(a)(ii)(2).  Judge Legg found that section 13.01(a)(ii)(2) applied in this case.  *See* Jan. 24, 2013 Mem. Op. 23.  To conclude whether each stall

---

[4] Those goods are canned foods, fresh-baked bakery items, baking ingredients, fresh or frozen meats and deli items, fresh uncooked fruits and vegetables, ice cream, frozen vegetables and frozen prepared foods, milk and milk products, butter, eggs, cheese, and pet foods.  Redner's Lease § 13.01(a)(ii)(2).

constituted an impermissible retail operator, Judge Legg explained, one would first have to determine the subject stall's "Gross Floor Area." *Id.* at 24. The next step would involve calculating the in-store sales areas devoted to the sale of the specifically enumerated goods listed in section 13.01(a)(ii)(2). *Id.* Finally, one would apply simple arithmetic to find whether the in-store sales areas devoted to the sale of those goods exceed, in the aggregate, twenty-five percent of the Gross Floor Area. *Id.*

Judge Legg also made findings as to the terms "Gross Floor Area" and "in-store sales areas." *Id.* at 25. Typically, a store has "perimeter walls that encompass its gross floor area." *Id.* Because the food stalls at the Joppatowne Plaza Shopping Center were not bound by perimeter walls on all sides, Judge Legg determined that the "Gross Floor Area" should consist of the area of the vendor's individual stall, excluding any common areas, such as a lobby or parking lot, which benefit all retailers. *Id.* Next, Judge Legg found "in-store sales areas" to include display cases, shelves, and racks. *Id.* at 25-26. Judge Legg rejected a more "expansive view" of "in-store sales areas," which might have encompassed "counter space used for cash registers," for example, or the "floor area on opposite sides of a display case where customers and employees stand while discussing merchandise." *Id.* at 25. A more restrictive definition of "in-store sales areas" was warranted, Judge Legg found, because the Redner's Lease used the term in reference to the areas in the stalls that actually "present" merchandise to customers. *Id.* at 26. Because the Redner's Lease offered no guidance on which space other than display cases, shelves, and racks should be counted, Judge Legg limited the definition of "in-store sales areas" to avoid any speculation regarding other areas, such as "sinks, prep tables, [and] employee work space." *Id.*

Applying Judge Legg's definitions and three-step analysis, this Court sets out the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

When the second stage of the bench trial began on July 1, 2013, the following issues were pending: (1) whether, applying Judge Legg's three-step analysis, Joppatowne breached its restrictive use covenant as to Beiler's BBQ, Beiler's Baked Goods, King's Cheese & Deli, and the two Vendor Stalls, and (2) whether Redner's is entitled to damages for lost profits caused by the infringing stalls. At the outset of trial, however, Redner's decided not to pursue certain claims, limiting the facts that this Court must find. First, Redner's indicated that it was only pursuing a claim of liability as to Beiler's Baked Goods, and not to Beiler's BBQ, King's Cheese & Deli, or the two Vendor Stalls. Second, assuming this Court finds that Beiler's Baked Goods infringes the restrictive use covenant, then Redner's seeks only injunctive relief as to Beiler's Baked Goods and not lost profits damages. Accordingly, any lost profits damages sought by Redner's would have to be attributable to the operation of Lapp's Fresh Meats and All Fresh Quality Seafood & Produce ("All Fresh"), which have already been found by this Court to violate the Redner's Lease.

### A. Beiler's Baked Goods

Jonathan McGowan ("McGowan"), the Plaintiff's expert architect, and Shellie Curry ("Curry"), the Defendant's expert architect, testified at trial regarding the "Gross Floor Area" and "in-store sales areas" of Beiler's Baked Goods. McGowan testified that the in-store sales areas devoted to the sale of fresh-baked bakery items exceed, in the aggregate,

twenty-five percent of the Gross Floor Area. Using Plaintiff's Trial Exhibit 51,[5] McGowan calculated the Gross Floor Area to be 952 square feet. That calculation excluded the space between the main portion of Beiler's Baked Goods and a large, "C"-shaped display area to its left. *See* Pl.'s Trial Ex. 51. The excluded space is used by customers to walk into the display area and to access the coffee bar, which extends off of the main portion of the Beiler's Baked Goods stall. *See id.*; Pl.'s Trial Ex. 52, RED 467, 434. Amish employees also use the space to restock the display shelves and coffee bar. *See* Pl.'s Trial Ex. 52, RED 465.

McGowan next calculated the in-store sales areas to be 301.75 square feet. *See* Pl.'s Trial Ex. 51. In performing this calculation, McGowan counted the square footage of the various display areas that are part of Beiler's Baked Goods, as well as several areas devoted to employee work space. *See id.* Using these calculations, McGowan concluded that Beiler's Baked Goods is an impermissible retail operator under section 13.01(a)(ii)(2) of the Redner's Lease, because its in-store sales areas represent 31.7 percent of the stall's Gross Floor Area.

On the other hand, the Defendant's expert Curry testified that Beiler's Baked Goods' in-store sales areas do not exceed twenty-five percent of the Gross Floor Area. Using Defendant's Trial Exhibit 65,[6] Curry calculated the Gross Floor Area to be 1,116.75 square

---

[5] Plaintiff's Trial Exhibit 51 is a graphic, two-dimensional diagram of the Beiler's Baked Goods stall. The diagram was originally prepared by Shellie Curry, the Defendant's expert architect, using measurements that Curry took by hand when he visited the Amish farmer's market at the Joppatowne Plaza Shopping Center in 2010. Those measurements were entered into a computer program called AutoCAD to produce the diagram. The diagram predates Judge Legg's findings of fact and conclusions of law on January 24, 2013, including the relevant definitions of "Gross Floor Area" and "in-store sales areas."

[6] Defendant's Trial Exhibit 65 is an updated version of the diagram marked as Plaintiff's Trial Exhibit 61. This version reflects Curry's understanding of the definitions of "Gross Floor Area" and "in-store sales areas" as set forth in this Court's January 24, 2013 Memorandum Opinion.

feet. In contrast with McGowan, Curry included the space that exists between the main portion of the Beiler's Baked Goods stall and the "C"-shaped display shelves and coffee bar.

Next, Curry calculated the in-store sales areas devoted to the sale of fresh-baked bakery items to be 236.5 square feet. He explained that his calculation differed from McGowan's calculation for two reasons. First, one portion of the stall, which McGowan calculated as 17.75 square feet, was only 13.5 square feet. *See* Def.'s Trial Ex. 64 (showing the square footage of one subset of Beiler's Baked Goods to measure 3'3" by 4'2"); Def.'s Trial Ex. 66 (comparing the calculations by McGowan and Curry). Second, Curry disregarded the areas devoted to employee work space—a total of sixty-one square feet—in his calculation of in-store sales areas, because Judge Legg defined the term to include only display areas, racks, and shelves. Judge Legg, Curry stated, specifically did not include work areas not used to offer merchandise to the customer. Considering a total Gross Floor Area of 1,116.75 square feet and in-store sales areas of 236.5 square feet, Curry found that 21.18 percent of the Gross Floor Area of Beiler's Baked Goods was in-store sales areas devoted to the sale of fresh-baked bakery items.

In the alternative, Curry performed the same three-step analysis using the "Gross Floor Area" of 952 square feet that McGowan calculated. *See* Def.'s Trial Ex. 67. In other words, Curry excluded from the Gross Floor Area the space between the main portion of Beiler's Baked Goods and the "C"-shaped display shelves and coffee bar. *See id.* Using the adjusted Gross Floor Area, Curry concluded that the in-store sales areas devoted to the sale of fresh-baked bakery items totaled to 24.84 percent of the Gross Floor Area of Beiler's

Baked Goods. *Id.* In either scenario, Curry testified that Beiler's Baked Goods did not meet the definition of a retail operator under section 13.01(a)(ii)(2) of the Redner's Lease.

This Court finds that McGowan's calculation understates the "Gross Floor Area" and overstates the "in-store sales areas," whereas Curry properly calculates both figures. First, the Gross Floor Area of Beiler's Baked Goods should include the space between the main portion of the stall and the "C"-shaped display shelves and coffee bar. Judge Legg defined "Gross Floor Area" as the square footage of the "individual stalls," excluding the "common areas" of the marketplace—for example, the main aisles, seating areas, lobby, and parking lot. Jan. 24, 2013 Mem. Op. 25 & n.36. The space that McGowan excluded is part of the individual stall and not a common area. Customers use the space to access the "C"-shaped display shelves and coffee bar. *See* Pl.'s Trial Ex. 51; Pl.'s Trial Ex. 52, RED 467, 434. In addition, Amish employees enter the space to restock the display shelves and coffee bar. *See* Pl.'s Trial Ex. 52, RED 465.

Redner's argued at trial that this space is akin to a main aisle, such that customers use it to circumvent Beiler's Baked Goods and reach other stalls. While it is not impossible that a customer might use the space as a shortcut to surrounding stalls, the photographic exhibits submitted by the Plaintiff do not suggest that use. *See* Pl.'s Trial Ex. 52, RED 467, 434, 465. Nor would such a use cause the space to qualify as a common area. In keeping with Judge Legg's definition, it is clear that the space at issue is not a main aisle; rather, its purpose is to provide areas adjacent to the coffee bar and large display shelves in which customers can approach and examine the merchandise that Beiler's Baked Goods offers. The space is integral to the individual stall and should be calculated as part of the Gross Floor Area.

Second, in his tally of the "in-store sales areas," McGowan miscalculated a specific portion of the Beiler's Baked Goods stall as 17.75 square feet. *See* Pl.'s Trial Ex. 51. That portion is actually 13.5 square feet, as Curry testified. *Compare id.*, *with* Def.'s Trial Ex. 65. Curry performed the measurements of Beiler's Baked Goods by hand in 2010. Based on Curry's measurements, the portion of the stall at issue is 3'3" by 4'2", or 13.5 square feet. *See* Def.'s Trial Ex. 64; Def.'s Trial Ex. 66. Therefore, McGowan improperly added 4.25 square feet to the stall's "in-store sales areas."

Finally, McGowan's calculation of the "in-store sales areas" of Beiler's Baked Goods should not have included the stall's employee work space. Judge Legg defined "in-store sales areas" restrictively to avoid "speculation as to what in addition to display areas the term might include." Jan. 24, 2013 Mem. Op. 26. Judge Legg explained that although the term clearly encompasses display areas, "the Lease offers no guidance for including or excluding other areas," such as "sinks, prep tables, employee work space, and a host of other areas visible to customers." *Id.* For this reason, Judge Legg narrowly defined the term to mean display areas, shelves, and racks. *Id.*

Applying Judge Legg's definition, employee work space is not part of a stall's "in-store sales areas." Redner's argued at trial that these spaces have windows through which the customers may view the Amish employees making the baked goods. *See* Pl.'s Trial Ex. 52, RED 464, 462. Yet this fact does not render the space part of the "in-store sales areas." As Judge Legg emphasized in defining the term, the "in-store sales areas" are where merchandise is presented for sale. Jan. 24, 2013 Mem. Op. 26. Aside from the obvious purpose of providing an area in which the Amish employees roll dough, set out baking

sheets, and move items in and out of the ovens, the space also displays to customers the method by which the Amish prepare their baked goods. *See* Pl.'s Trial Ex. 52, RED 464, 462. However, at the windows of the work space, a customer is not presented with the merchandise ready for purchase. By contrast, the baked goods in the display cases, shelves, and racks are on view such that a customer could select an item, either by picking it out with his own hands or with the assistance of an employee, and accept it for purchase. Accordingly, the sixty-one square feet of work space that McGowan designated as in-store sales areas should not have been so designated.

To summarize, this Court finds that the calculations offered by the Defendant's expert Curry are correct. The Gross Floor Area of Beiler's Baked Goods is 1,116.75 square feet. The stall's in-store sales areas devoted to the sale of fresh-baked bakery items equal 236.5 square feet. Thus, the in-store sales areas represent 21.18 percent of the Gross Floor Area of Beiler's Baked Goods and is therefore not violative of section 13.01(a)(ii)(2) of the Redner's Lease.

B.    Lost Profits Damages

Gary O'Brien ("O'Brien"), the Vice President of Perishable Retail Operations for Redner's, testified regarding alleged lost profits suffered by Redner's. According to O'Brien, these damages arose out of the operation of Lapp's Fresh Meats and All Fresh Quality Seafood and Produce ("All Fresh"), both of which have been found to infringe the restrictive use covenant. Joppatowne offered the testimony of Joppatowne's corporate representative Robert E. Fowler, Esq. ("Fowler") regarding the damages calculations to which O'Brien testified and specific factors which O'Brien did not take into account.

During O'Brien's testimony, he referred to Plaintiff's Trial Exhibit 50, a document containing week-by-week sales and profits figures for the meat and seafood departments at Redner's. *See* Pl.'s Trial Ex. 50. Using these figures, O'Brien calculated weekly sales averages for the two departments. *See* Pl.'s Trial Ex. 54 (Redner's meat department); Pl.'s Trial Ex. 55 (Redner's seafood department). O'Brien then calculated the average weekly sales for the year prior to the opening of the Amish farmer's market as a baseline for comparison and offered conclusions of the weekly losses allegedly caused by Joppatowne.

As for the Redner's meat department, O'Brien found the weekly sales average in the year prior to the opening of the Amish farmer's market to be $12,886.64. *See* Pl.'s Trial Ex. 54. Using that figure as a baseline, O'Brien calculated the weekly sales average for the first year after the market's opening (March 20, 2011 to March 17, 2012), to be $12,296.92, with an average weekly loss of $589.73. *Id.* In the second year after the market's opening (March 18, 2012 to March 16, 2013), the Redner's meat department had average weekly sales of $11,600.86, resulting in an alleged weekly loss of $1,285.78. *Id.* During the remaining period in which Lapp's Fresh Meats was open and sales figures of Redner's were available (March 17, 2013 to June 8, 2013), O'Brien calculated a weekly sales average for the Redner's meat department of $10,347.71 and an average weekly loss of $2,538.94. *Id.*

In total, O'Brien testified that the Redner's meat department suffered lost profits from the operation of Lapp's Fresh Meats in the amount of $127,993.50. *See id.* On cross examination, O'Brien admitted that the products offered by Lapp's Fresh Meats did not mirror the Redner's meat department offerings. While Redner's offers meats of all kinds,

Lapp's Fresh Meats sold only red meat, pork, and certain "processed" meats, such as marinated steaks. Unlike Redner's, Lapp's Fresh Meats did not sell any poultry.

O'Brien performed the same calculations for the seafood department at Redner's and offered his conclusions regarding lost profits arising out of the operation of All Fresh Quality Seafood & Produce ("All Fresh"). *See* Pl.'s Trial Ex. 55. During his testimony, however, O'Brien adjusted his figures to account for the fact that All Fresh opened in late May 2011 and closed on August 31, 2012. *See* Pl.'s Trial Ex. 57. The baseline that O'Brien used to compare the weekly sales after All Fresh opened was $1,548.50, the weekly sales average of the Redner's seafood department from March 20, 2010 to March 19, 2011. *See* Pl.'s Trial Ex. 55. Applying that baseline, O'Brien calculated an average weekly loss of $22.59 for the first year after All Fresh opened and an average weekly loss of $242.36 in the second year after All Fresh opened. *Id.* In total, O'Brien testified that the seafood department at Redner's suffered lost profits in the amount of $6,083.75 from the operation of All Fresh. *See* Pl.'s Trial Ex. 57.

Joppatowne's corporate representative Robert Fowler also testified regarding the claim for lost profits damages. Fowler is a manager of shopping centers for The Cordish Company, of which Joppatowne is a division. He testified regarding various factors that could have affected the weekly losses that Redner's claims to have suffered. Fowler offered testimony primarily regarding a Save-a-Lot grocery store located approximately 3.3 miles away from Redner's on Route 40. Save-a-Lot is a low-cost store that competes with Redner's and whose landlord is The Cordish Company. Fowler testified that before Joppatowne signed the Redner's Lease, Joppatowne asked Redner's to reduce the restrictive

use covenant's five-mile reach to three miles, to allow the Save-a-Lot store to operate. Instead, Redner's permitted an exclusion of the Save-a-Lot from the Redner's Lease while keeping the five-mile radius in the restrictive use covenant. *See* Ex. D to the Redner's Lease, p. 000496, Joint Trial Ex. 12.

The Save-a-Lot on Route 40 opened in January 2011, just two months before the Amish farmer's market opened. It features a seafood department, which sells frozen seafood items, and a meat department, offering fresh meats of all kinds. The Save-a-Lot does not feature an in-store bakery, so none of the baked goods it sells are fresh-baked in the store. Fowler testified that this Save-a-Lot offers merchandise comparable to that of Redner's and that the two stores' designs and display cases are similar. While Redner's operates in a space of about 54,000 square feet, Save-a-Lot is much smaller, with about 18,000 square feet of space. The Save-a-Lot operates every day from approximately 8:00 a.m. to 10:00 p.m. Redner's, by comparison, is open every day, twenty-four hours per day.

On the other hand, the Amish farmer's market at the Joppatowne Plaza Shopping Center is open only three days each week—Thursday, Friday, and Saturday—from approximately 10:00 a.m. to 5:00 p.m. All Fresh, which is not affiliated with the market, is open on those same three days as well as Sunday and has similar hours of operation. According to Fowler, All Fresh sold mostly frozen seafood. Lapp's Fresh Meats, as testified to by O'Brien, offered red meat and pork, but no poultry.

As a manager of shopping centers leased by The Cordish Company, Fowler was aware of a dramatic drop in Save-a-Lot's sales in 2012, as compared to 2011. *See* Def.'s Trial Ex. 46. Fowler also knew that Redner's suffered a similar loss in sales in 2012. Based on

Fowler's knowledge, it appears that there was an overall drop in sales for grocery stores in the Joppatowne area in 2012.

Finally, Fowler testified to other grocery stores that are nearby to Redner's. Between Redner's and Save-a-Lot on Route 40, there are also Mars and Aldi grocery stores. *See* Pl.'s Trial Ex. 56. Beyond Save-a-Lot on Route 40, in the opposite direction of Redner's, is a Food Lion. *Id.*

## III.    CONCLUSIONS OF LAW

The issues pending before this Court are (1) whether Joppatowne breached the restrictive use covenant as to Beiler's Baked Goods, and (2) whether Redner's is entitled to lost profits damages arising out of the operation of the infringing stalls, Lapp's Fresh Meats and All Fresh Quality Seafood & Produce ("All Fresh"). As explained in Section II *supra*, Redner's abandoned its breach of contract claims as to Beiler's BBQ, King's Cheese & Deli, and the two Vendor Stalls, as well as its damages claim relating to any lost profits allegedly caused by Beiler's Baked Goods. For the reasons that follow, this Court enters Judgment in favor of Joppatowne and against Redner's on the remaining claim of liability and finds that Redner's has failed to prove lost profits damages.

### A.    Alleged Breach of the Restrictive Use Covenant as to Beiler's Baked Goods

In its Findings of Fact, this Court found the calculations offered by the Defendant's expert architect Shellie Curry to be correct. The "Gross Floor Area" of Beiler's Baked Goods is therefore 1,116.75 square feet and includes the space between the main portion of the stall and the "C"-shaped display shelves and coffee bar. The "in-store sales areas" devoted to the sale of fresh-baked bakery items is 236.5 square feet and excludes employee

work space. Thus, the in-store sales areas of Beiler's Baked Goods represent only 21.18 percent of the Gross Floor Area, and the stall is not an infringing retail operator under section 13.01(a)(ii)(2) of the Redner's Lease.

It is worth noting that even if the "Gross Floor Area" excluded the space that Redner's considers a common area, the "in-store sales areas" of Beiler's Baked Goods would not exceed twenty-five percent of the Gross Floor Area. Curry performed the same three-step analysis using McGowan's Gross Floor Area figure of 952 square feet. *See* Def.'s Trial Ex. 67. In this alternate scenario, Curry found that the in-store sales areas devoted to the sale of fresh-baked bakery items totaled to 24.84 percent of the Gross Floor Area. *Id.* Under either scenario, then, Beiler's Baked Goods is a permissible use. For these reasons, Joppatowne does not violate the restrictive use covenant of the Redner's Lease by permitting Beiler's Baked Goods to operate, and Judgment is entered in favor of Joppatowne and against Redner's as to this final breach of contract claim.

B.  <u>Alleged Lost Profits Damages</u>

For Joppatowne's violation of the restrictive use covenant as to Lapp's Fresh Meats and All Fresh, Redner's seeks damages in the form of lost profits. Through the testimony of Gary O'Brien ("O'Brien"), the Vice President of Perishable Retail Operations for Redner's, Redner's sought to prove lost profits in the meat department of $127,993.50 and in the seafood department of $6,083.75. *See* Pl.'s Trial Exs. 54-55, 57. A plaintiff can recover lost profits where (1) the plaintiff shows that the defendant's breach caused the loss; (2) the defendant could have reasonably foreseen that a loss of profits would be a probable result of breach at the time the defendant executed the contract; and (3) the lost profits can be proved

with reasonable certainty. *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 907 (Md. 1978). Damages may not be awarded if the computation is based on "speculation or guesswork." *Atkinson Warehousing & Distrib. Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 669 (D. Md. 2000) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).

For two reasons, damages for lost profits will not be awarded in this case. First, Redner's failed to prove, as it must, that its lost profits were caused by Joppatowne's breach. *See Impala*, 389 A.2d at 907. As Fowler testified, just two months before the Amish farmer's market opened at the Joppatowne Plaza Shopping Center, a Save-a-Lot opened 3.3 miles away on Route 40. Save-a-Lot is a low price competitor of Redner's, has similar hours of operation, and offers like merchandise. O'Brien's lost profits analysis did not account for the possibility that some of Redner's lost profits may have been attributable to Save-a-Lot.

As for Lapp's Fresh Meats and All Fresh, Redner's offered no evidence of their sales volume. To award damages in Redner's favor, Redner's asks this Court to assume that its lost profits are attributable to those infringing stalls, even though the Court has no knowledge of how successful either stall was in selling its merchandise. In addition, the stalls had much shorter hours of operation and, in the case of Lapp's Fresh Meats, offered a more limited variety of products. Considering all of these factors that distinguish the farmer's market stalls from Redner's and its direct competitor Save-a-Lot, this Court doubts that Joppatowne was the sole cause of the entire lost profits of the meat and seafood departments at Redner's to which O'Brien testified.

Second, O'Brien's damages calculation was based on impermissible speculation and guesswork. *See Bigelow*, 327 U.S. at 264. As explained in more detail in Section II.B of this

Memorandum Opinion, O'Brien's analysis relied on a baseline comparison of the year prior to the opening of the Amish farmer's market at the Joppatowne Plaza Shopping Center. Yet O'Brien did not explain why such a baseline was appropriate or reliable. It could be that the sales of meat and seafood at Redner's during the year prior to the opening of the market were influenced by external factors that render those figures an imperfect baseline from which to compare subsequent years of sales. Redner's offered no explanation for O'Brien's method. Moreover, Fowler testified that there was a decline in profits for both Redner's and Save-a-Lot in 2012. This fact suggests that the lost profits to which O'Brien testified may not accurately reflect the overall market impact on sales at Redner's. O'Brien did not speak to this issue in testimony and Redner's offered no reason to discount it. Finally, because Redner's failed to show the sales volume of Lapp's Fresh Meats and All Fresh, this Court cannot test the lost profits calculations by O'Brien by comparing them to the sales generated by the stalls.

At bottom, O'Brien's method for calculating damages failed to account for other factors that may have impacted the sales of meat and seafood at Redner's. For this reason, Redner's has not proved its lost profits attributable to Joppatowne with "reasonable certainty." *Impala*, 389 A.2d at 907. Rather, Redner's has relied on guesswork and speculation that this Court may not accept. *See Bigelow*, 327 U.S. at 264. Accordingly, its claim for lost profit damages fails.

## IV. CONCLUSION

For the reasons stated above, Judgment is hereby entered in favor of the Defendant Joppatowne G.P. Limited Partnership and against the Plaintiff Redner's Markets, Inc., to the

extent that Beiler's Baked Goods was found by this Court not to violate the restrictive use covenant of the Redner's Lease. Moreover, while Redner's has been granted injunctive relief as to the infringing stalls Lapp's Fresh Meats and All Fresh Quality Seafood & Produce in this Court's previous Order of Permanent Injunction (ECF No. 159), Redner's is not entitled to lost profits, as it failed to prove those damages with reasonable certainty at trial.

A separate Order and Judgment follows.


Dated: July 11, 2013      _____/s/_____
          Richard D. Bennett
          United States District Judge